**IT IS ORDERED as set forth below:**



Date: June 13, 2017

_____
**Wendy L. Hagenau
U.S. Bankruptcy Court Judge**

_____

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| IN RE: | ) | CASE NO. 14-60345-WLH |
| | ) | |
| GUY MARCEL SIEWE, | ) | CHAPTER 7 |
| | ) | |
| Debtor. | ) | JUDGE WENDY L. HAGENAU |
| | ) | |
| | ) | |
| MARIA GRAZIA LOCCI, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | ADV. NO. 14-5321 |
| | ) | |
| GUY MARCEL SIEWE, | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |

### ORDER DENYING DEBTOR A DISCHARGE

Rarely does this Court encounter a situation where the parties tell stories completely incapable of reconciliation. Such is the case here. To complicate matters, the stories are told by parties and witnesses, none of whom speak English as their first language and two of whom testified through French and Italian interpreters. The story is central to the trial of Plaintiff's Complaint objecting to the Debtor's discharge under 11 U.S.C. § 727(a)(2), (a)(3), (a)(4), (a)(5)

1

and (a)(6) and objecting to the dischargeability of Plaintiff's claim under 11 U.S.C. § 523(a)(2)(A), (a)(2)(B), (a)(4) and (a)(6). The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(J) and (I).

## FINDINGS OF FACT

The story begins with Chantal Pouassi, the ex-wife of Guy Siewe (the "Debtor"). Ms. Pouassi is originally from Cameroon but was studying in Turin, Italy to become a medical doctor. While there, she met Maria Locci in 1997. Ms. Pouassi rented an apartment from Ms. Locci, and Ms. Locci helped take care of Ms. Pouassi's daughter. Ms. Locci and Ms. Pouassi became good friends and treated each other as mother and daughter. Ms. Pouassi considered Ms. Locci her godmother.

The Debtor met Ms. Pouassi in France in 1998 while she was there for a medical residency program. At the time, the Debtor was a student. The Debtor and Ms. Pouassi dated. She traveled between France and Italy for several years. In June 2001, the Debtor and Ms. Pouassi had a son. They subsequently married on July 27, 2002. One of the witnesses to their marriage was Maurice Ngatche, the Debtor's uncle. After Ms. Pouassi's graduation from medical school, she moved to Paris permanently to be with the Debtor.

In the meantime, the Debtor worked with his uncle, Mr. Ngatche, and also on his own in the renovation business. The Debtor would buy apartments and/or homes in Paris and elsewhere in France, renovate them and sell or lease them. The Debtor, together with his brother and their children, owned a company called Sogrim through which they conducted this renovation business. The Debtor was the manager of Sogrim. This business was used from 2002 until approximately 2005. In 2001, the Debtor and Ms. Pouassi created a company called SIPO. The Debtor owned 35% of the company and was its manager, while Ms. Pouassi owned the

2

remaining 65% of the company.  SIPO bought at least one house and two apartments.  It owned property located at 9 rue Giuseppe Garibaldi in La Courneuve City, France.  It also owned an apartment at 12 Labat Road in Paris and an apartment at Jules Massenet in Clichy-Sous-Bois, also in France. Each of the foregoing three properties was sold by SIPO in December 2008 to facilitate the Debtor's and Ms. Pouassi's immigration to the United States.  The company continued in business until approximately 2010.  The Debtor created a third company called Feel at Home, which he also owned with his brother.  This company began in 2005 when Sogrim was shut down.  The Debtor had at least a 10% interest in Feel at Home.  He continued this business until approximately 2010 when he transferred his interest to his brother.  Feel at Home was in the business of cleaning large facilities such as hospitals.

In 2007, the Debtor and Ms. Pouassi decided to immigrate to the United States.  Ms. Pouassi moved to the United States in February 2007 with her two children, while the Debtor stayed behind in Paris.  In 2008, Ms. Pouassi moved to Atlanta.  She planned to complete the necessary training to become licensed as a doctor in the United States.  The Debtor and Ms. Pouassi expected to get their permanent status (i.e., green card) through an immigration program called the EB-5 program.  This program is intended for entrepreneurs and their families and requires a minimal investment of $500,000 in certain qualifying enterprises in the United States with the idea that these enterprises will create jobs in certain areas. In the case of the Debtor and Ms. Pouassi, they understood they needed $500,000 to invest, and they invested in a company called Jay Peak Hotel Suites Phase II LP ("Jay Peak") which owns a ski resort in Vermont.  The application to the EB-5 program required various statements and representations including ones to the effect that the money being invested was not borrowed and was the applicant's money to invest.  The Debtor completed the forms, made the required representations and invested the money in Jay Peak in 2008 and 2009.  The source of the money for the investment according to

3

the Debtor was the sale of the house on Garibaldi and the sale of the Labat Road and Jules Massenet apartments. With respect to the Labat Road and Jules Massenet apartments, though, the transaction was not an absolute sale, as the Debtor retained the right to repurchase the properties by a certain date. Ultimately, the two apartments were not repurchased. The Debtor did not move to the United States permanently until March 2011, although he obtained his green card in 2009 and did visit the United States and Ms. Pouassi at least in 2009.

After the Debtor moved permanently to the United States, he and Ms. Pouassi were involved in two different divorce proceedings: one in 2012 and one in 2014. The divorce was finalized on June 29, 2015 (after this bankruptcy petition was filed). On May 2, 2013, Ms. Locci filed a complaint in the Superior Court of Gwinnett County seeking to recover the 503,170€ evidenced by the Acknowledgement of Debt discussed below. A default judgment was entered against the Debtor on October 4, 2013. When Ms. Locci began garnishing the Debtor's wages, he filed this bankruptcy petition on May 28, 2014.

The focus of this case is on loans allegedly made by Plaintiff, Ms. Locci, to the Debtor and Ms. Pouassi. Plaintiff states that, during the period 1999 through 2004, she loaned the Debtor and Ms. Pouassi 503,170€. In November 1999, Ms. Locci provided 18,075.99€ to the Debtor and Ms. Pouassi, allegedly to enable the Debtor to purchase a truck for his business. This loan was evidenced by bank records from Ms. Locci's bank identifying the Debtor as the beneficiary of the transaction. In September and November 2001, Ms. Locci loaned the Debtor and Ms. Pouassi 62,000€ and 67,000€ respectively allegedly to purchase a house. In June 2002, Ms. Locci loaned the Debtor and Ms. Pouassi another 155,000€, again to purchase a house which Ms. Locci believes to be the Garibaldi house in Paris. This loan was evidenced by four bank drafts made payable to the Debtor, the backs of which appear to be endorsed by the Debtor. In August 2002, Ms. Locci contends she loaned the Debtor and Ms. Pouassi 101,000€. The August

4

loan was evidenced by three bank drafts again made payable to the Debtor with his apparent endorsement on the back. In January 2003, Ms. Locci loaned the Debtor and Ms. Pouassi 35,000€ to enable the Debtor to purchase machinery and supplies. In December 2003, Ms. Locci alleges she loaned the Debtor and Ms. Pouassi 30,000€ so the Debtor could purchase a truck. The loan is evidenced by bank records showing a transfer of funds from Ms. Locci to the Debtor. In February 2004, Ms. Locci contends she loaned the Debtor and Ms. Pouassi 60,000€, all of which was given to Ms. Pouassi in cash allegedly for the purpose of the Debtor's renovation business. Finally, in October 2004, Ms. Locci contends she loaned another 7,000€ to the Debtor and Ms. Pouassi. Ms. Locci produced at the trial certified copies of a variety of bank documents, including bank drafts and wire transfer verifications which documented at least 304,000€ provided to the Debtor.

The Debtor makes a general denial that he received any loans from Ms. Locci. He acknowledges in his testimony, however, that Ms. Locci provided financial assistance to him and his wife on several occasions. He acknowledges she provided 74,000€ for the purchase of the Garibaldi house; he acknowledges she provided a guaranty for him to purchase certain equipment; he acknowledges approximately 18,000€ provided to the family and used for Ms. Pouassi's daughter's school tuition. In the Debtor's Rule 2004 examination[1], he testified that Ms. Pouassi told him Ms. Locci had asked for a repayment of all of the money and assistance she had provided to Ms. Pouassi and the Debtor. Ms. Pouassi informed the Debtor that Ms. Locci had kept records of the loans in a journal and it was Ms. Pouassi's position that terms of repayment to Ms. Locci needed to be agreed upon prior to spending money for the Debtor's master's degree. The Debtor contends he only owes approximately $9,600 to Ms. Locci from

---

[1] The deposition was admitted into evidence without objection.

5

these various transactions, but introduced no documentary or other evidence of his alleged repayments.

The irreconcilable testimony between the Debtor and Ms. Pouassi and Ms. Locci involves the execution of an Acknowledgement of Debt. The original document was submitted to the Court for review and states it was signed on September 23, 2009.[2] This Acknowledgement of Debt states it is by the Debtor and Ms. Pouassi, and they "hereby recognize owing the sum of 503,170€" to Ms. Locci. The Acknowledgment of Debt states they expect to receive the sum of $500,000 from the EB-5 program in 2015 and this amount would be applied to the repayment of Ms. Locci's debt. The document states that Mr. Siewe "totally and irrevocably remove[s] myself from the management of this sum. At the request of mama Maria Grazia Locci on this day, the management of this sum is entrusted to my spouse, Josephine Chantal Pouassi, who irrevocably commits to earmark the totality of this sum to mama Maria Grazia Locci or to another recipient expressly indicated by her." The parties expected this $500,000 credit to translate to roughly 340,000€, leaving a balance of 163,170€ owed. The Acknowledgement of Debt states that Ms. Locci would suspend the payment of this balance until the end of 2010 or until at least either Ms. Pouassi or the Debtor found a stable job in the United States. Finally, the Acknowledgement of Debt contemplates that the balance of the debt would be paid off by either a permanent sale of the two apartments referenced above (the parties apparently contemplating that the Debtor would repurchase the apartments under the option and then sell them permanently) or recovery of the sum of 71,000€ "blocked for control by the financial brigade of Nancy [France]".[3] The

---

[2] The original is in French but a translated copy was provided to the Court.
[3] The Debtor denies there were ever funds blocked by the financial brigade, but Ms. Pouassi and Plaintiff both testified the Debtor stated it had happened.

6

document bears signatures purporting to be those of Ms. Locci, Ms. Pouassi, and Mr. Siewe, and the document is purportedly witnessed by Mr. Ngatche.[4]

Ms. Locci and Ms. Pouassi testified that they met with the Debtor and his uncle, Mr. Ngatche, at the uncle's house in Paris where the Debtor was living in 2009.  Plaintiff testified that the meeting to sign the Acknowledgement of Debt was suggested by Ms. Pouassi.  Ms. Locci testified she took the train to Paris where Ms. Pouassi picked her up and took her to Mr. Ngatche's house.  Ms. Locci's testimony was not that Mr. Ngatche lived in the house but that he owned it and Mr. Siewe was living in it.  Ms. Pouassi testified she saw Mr. Siewe, Mr. Ngatche and Ms. Locci sign the document.  Ms. Locci testified that Mr. Siewe typed up the document from information she provided him as to the amounts owed.  On the other hand, the Debtor and Mr. Ngatche testified under oath that the meeting never happened.  They testified there was no meeting, there was no document signed, and the signatures on the Acknowledgement of Debt are not theirs.

Plaintiff retained an expert to review the original Acknowledgement of Debt and express an opinion as to the authenticity of the Debtor's signature.  The expert compared the Debtor's signature on the original Acknowledgement of Debt to copies of several documents which the Debtor admitted contained his signature.  The expert opined with a high degree of certainty that the signature on the Acknowledgement of Debt was probably that of the Debtor.  He stated the only reason he could not be absolutely certain the signature was the Debtor's was because the documents to which he was comparing the original were copies and copies were simply not as

---

[4] Not all of the loans could be traced to the Debtor and the Court finds some of the loans were arranged by Ms. Pouassi.  But Plaintiff' claim is not based on quantum meruit.  It is based on the Acknowledgment of Debt which is a contract claim.  Sufficient consideration exists for the Acknowledgment of Debt.  The Court has found documentary evidence of over 300,000€ provided to the Debtor.  To the extent the Debtor did not receive or receive direct benefit of the other 200,000€, his acknowledgment of liability for the full debt is valid since the money was undisputedly provided to his wife.  At a minimum, the Acknowledgement of Debt effectively guarantees his wife's obligation to Ms. Locci.

7

good a basis for comparison as other originals.  Plaintiff's expert testified further there was no evidence the signature was forged, as he saw no evidence of halting writing or other marks that looked like someone trying to copy a signature.  No contradictory expert testimony was offered by the Debtor.[5]

The Court finds Plaintiff has established by a preponderance of the evidence that the Debtor signed the Acknowledgement of Debt.  While one might argue about the motive of any of the four signatories to the document to acknowledge or deny their signature, the testimony of Plaintiff's expert witness is untainted by motive.  The expert was a retired FBI and GBI forensic expert, and the Court found him credible.  He testified with a high degree of certainty the signature was probably that of the Debtor.  No contradictory impartial testimony was provided.  This is certainly sufficient evidence to meet a preponderance of the evidence standard.

But the Court's finding that the Debtor signed the Acknowledgement of Debt is also based on other evidence.  While the Debtor generally denies receiving any money or any loans from Ms. Locci, he acknowledges specific instances of receiving money from her.  Ms. Locci also provided certified copies of bank drafts containing the Debtor's apparent signature on the back and of wire transfer verifications to an account in the name of the Debtor.  Finally, in connection with the divorce of the Debtor and Ms. Pouassi, the Debtor signed a financial affidavit acknowledging a joint debt with Ms. Pouassi to Ms. Locci in the amount of $600,000.  This additional testimony further buttresses the expert's opinion that the Debtor signed the Acknowledgement of Debt.  Finally, the Court notes that the Debtor's Acknowledgement of Debt owed to Ms. Locci would likely contradict the information he provided in connection with

---

[5] Mr. Ngatche testified he did not sign the Acknowledgement of Debt as a purported witness.  Mr. Ngatche's signature as a witness is not critical to the enforceability of the Acknowledgement of Debt or even to whether the Debtor signed the Acknowledgement of Debt.  His testimony raises the issue, though, of the credibility of Plaintiff and Ms. Pouassi as he disputed their testimony.  Mr. Ngatche provided the Court several examples of his signature: on the Debtor's and Ms. Pouassi's marriage certificate, on his passport, and on a paper he signed in Court before the judge.  While there are similarities in all the signatures, no two appear alike to the Court.  The Court discounts Mr. Ngatche's testimony in light of the other, objective evidence that the Debtor signed the Acknowledgement of Debt.

his immigration application and EB-5 program. The information provided by Ms. Locci suggests she was the source of the money used to purchase the house and the apartments, which were then sold and the proceeds of which were invested in the EB-5 program. This contradicts the Debtor's statements made in connection with his immigration process. Based on all the evidence the Court finds the Debtor signed the Acknowledgement of Debt.

In connection with the filing of his bankruptcy case, the Debtor filed his Schedules and Statement of Financial Affairs ("SOFA"). In answer to SOFA Question No. 2 regarding any additional income not from regular employment, the Debtor responded "NONE". The Debtor did not disclose that he was receiving interest income from Jay Peak. In response to SOFA Question No. 10, which asks the debtor to identify transfers made within two years, the Debtor responded "NONE". The Debtor failed to disclose that he made regular payments to Ally Financial on his girlfriend's Hummer in the amount of approximately $155 per month. Since the Debtor was not obligated on this debt, the payments were simply transfers. In response to SOFA Question No. 18, regarding any businesses in which the debtor had owned more than 5% or been CEO, CFO or manager within six years, the Debtor responded "NONE". The Debtor did not disclose his interest in SIPO or Feel at Home, in both of which he had been manager and held more than 5% interest at least as late as 2010. In the Debtor's Schedule B, he failed to disclose a potential personal injury action. The Trustee ultimately discovered the personal injury action and was able to collect on it. Finally, on Schedule J, the Debtor identified four dependent children. Only two of the children are his children. The other two are his girlfriend's children.

The Debtor amended his SOFA and Schedules on October 28, 2016 [Docket No. 57] to show he held an interest in Lorvine's House of Beauty, a company operated by his girlfriend. On February 24, 2017, during the trial of this matter, the Debtor amended his SOFA and Schedules again [Docket No. 61] to identify the personal injury action on Schedule B, to amend

9

Schedule J to show the $155 per month car payment, and to amend his SOFA to add Feel at Home and SIPO as companies in which he had held in interest within the prior six years.

On October 10, 2014, Plaintiff filed her complaint alleging the Debtor should be denied a discharge under 11 U.S.C. § 727(a)(2), (a)(3), (a)(4), (a)(5) and (a)(6) and that her claim should be deemed non-dischargeable under 11 U.S.C. § 523(a)(2)(A), (a)(2)(B), (a)(4) and (a)(6). The complaint also sought punitive damages under state law and attorney's fees under O.C.G.A. § 13-6-11. After the Debtor responded and many discovery disputes were resolved, the trial of this matter began on February 21, 2017. Ms. Locci traveled to the Court from Italy and spoke through an Italian interpreter. At the conclusion of four days of trial, the Debtor asked that the evidence remain open to allow him an opportunity to bring Mr. Ngatche from France. The Court granted the request. On March 28, 2017, Mr. Ngatche testified in Court through a French interpreter. The parties then provided the Court with post-trial briefing.

## LEGAL CONCLUSION

Plaintiff contends the Debtor's discharge should be denied under 11 U.S.C. § 727(a)(2), (a)(3), (a)(4), (a)(5) and (a)(6). Because one of the fundamental goals of the Bankruptcy Code is to provide a debtor with a fresh start, "[a] denial of a discharge is an extraordinary remedy and therefore, statutory exceptions to discharge must be construed liberally in favor of the debtor and strictly against the objecting party." Eastern Diversified Distribs., Inc. v. Matus (In re Matus), 303 B.R. 660, 671 (Bankr. N.D. Ga. 2004) (citations omitted). "[T]he reasons for denying a discharge … must be real and substantial, not merely technical and conjectural." Equitable Bank v. Miller (In re Miller), 39 F.3d 301, 304 (11th Cir. 1994) (citations omitted). The burden of proving the objection to discharge is generally on Plaintiff, Fed. R. Bankr. P. 4005, and the burden must be carried by a preponderance of the evidence. Grogan v. Garner, 498 U.S. 279 (1991).

10

**False Oaths**

To deny a debtor a discharge under Section 727(a)(4)(A), a plaintiff must show "… the debtor knowingly and fraudulently, in or in connection with the case – (A) made a false oath or account; …". 11 U.S.C. § 727(a)(4)(A). Under this section, a plaintiff must show there was a false oath, that it was material, and that it was made knowingly and fraudulently. A misrepresentation is material "if it bears a relationship to the [debtor's] business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of property." Chalik v. Moorefield (In re Chalik), 748 F.2d 616, 618 (11th Cir. 1984) (cites omitted). Detriment to creditors need not be shown. Id. Furthermore, the debtor may not defend himself by claiming the assets omitted were worthless. Id. "Creditors are entitled to judge for themselves what will benefit, and what will prejudice, them." Id. While the definition of materiality is broad, it is not without limits as the purpose of the requirement the debtor make disclosures is to allow the trustee or creditors to investigate the debtor's affairs and recover any assets without "costly investigations". Fogal Legware of Switz., Inc. v. Wills (In re Wills), 243 B.R. 58, 63 (B.A.P. 9th Cir. 1999). So if the omission would not assist or impede the debtor or creditors in this endeavor, it is not material. Id.; see also Cadle Co. v. Pratt (In re Pratt), 411 F.3d 561, 568 (5th Cir. 2005) (failure of debtor to list his position as trustee of trust for his children was not material because the knowledge would not assist the debtor's creditors); Spencer v. Blanchard (In re Blanchard), 201 B.R. 108, 130 (Bankr. E.D. Pa. 1996) (undervaluing assets that would have been exempt was not material); Manning v. Watkins (In re Watkins), 474 B.R. 625, 654-55 (Bankr. N.D. Ind. 2012), aff'd sub nom.; Manning v. Watkins, 2013 WL 3989412 (N.D. Ind. July 31, 2013) (failure to disclose interest in corporations not material to administration of the estate); Ivory v. Barbe (In re Barbe), 466 B.R. 737, 748 (Bankr. W.D. Pa. 2012) (failure to disclose dismantled stage immaterial because had no value).

Finally, a plaintiff must show that the omission or misstatement was made knowingly and with intent to deceive. A plaintiff must demonstrate actual common, not constructive, fraud, Wines v. Wines (In re Wines), 997 F.2d 852, 856 (11th Cir. 1993), but actual intent may be inferred from circumstantial evidence. Ingersoll v. Kriseman (In re Ingersoll), 124 B.R. 116, 122-23 (M.D. Fla. 1991). Furthermore, "a reckless indifference to the truth is sufficient to constitute the requisite fraudulent intent for denying a discharge under section 727". Cadle Co. v. Taras (In re Taras), 2005 WL 6487202, at *4 (Bankr. N.D. Ga. Aug. 19, 2005) (citation omitted). A series or pattern of errors or omissions may have a cumulative effect giving rise to an inference of intent to deceive. Beaubouef v. Beaubouef (In re Beaubouef), 966 F.2d 174, 178 (5th Cir. 1992). The discharge may not be denied, however, when the untruth was the result of a mistake or inadvertence. Id. Further, while the omission of worthless assets may be material, the value of the asset omitted may be evidence of the debtor's intent, or lack thereof, to deceive. See Garcia v. Coombs (In re Coombs), 193 B.R. 557, 565-66 (Bankr. S.D. Cal. 1996).

Plaintiff contends the Debtor made several false oaths in his Schedules and in his testimony, including his failure to disclose his interest in SIPO and Feel at Home within the six years prior to the filing of the petition, his failure to disclose his automobile accident, his failure to disclose the payments made on behalf of his girlfriend for her Hummer, and his identification of four dependents on Schedule J rather than two. There is no doubt the Debtor should have identified the payments on his girlfriend's Hummer in response to Question No. 10, his interest in Feel at Home and SIPO in response to Question No. 18, his other income from Jay Peak in response to SOFA Question No. 2, and his car accident on Schedule B.[6] All of these omissions are material because they all relate to the Debtor's assets and the disposition of the Debtor's

---

[6] Whether the Debtor had two or four dependents is a more complicated question and turns on facts not in evidence and conflicting legal positions on determining dependents. The Court does not address this question because it is not necessary for the resolution of this matter.

12

property. Whether the Debtor intended to deceive by failing to respond truthfully to these questions is more difficult to judge. The Court need not reach that answer, though.

The single most important false oath made by the Debtor is his repeated denial that the signature on the Acknowledgement of Debt was his. The Court has found as a fact that the Debtor signed the Acknowledgement of Debt. The Debtor denied it at trial on a number of occasions. In addition, he denied it in his Rule 2004 examination. Each of those denials was under oath; each was false; each was material. The debt to Ms. Locci is the Debtor's largest debt; it was Ms. Locci's judgment and garnishment that precipitated the Debtor's bankruptcy filing. Whether he owed that debt was key to understanding the Debtor's business dealings and the claims against the estate. In determining whether the Debtor had an intent to deceive by denying his signature on the Acknowledgement of Debt, the Court must look at all of the circumstances. This is not a case where the answer to the questions was in a gray area or where the Debtor could have misunderstood the question. The question asked was whether he signed the Acknowledgement of Debt; his answer was no; the Court has found that to be false. The Court concludes the Debtor intended to deceive the Court by failing to acknowledge his debt. Whether the Debtor was motivated in his deceit by his dislike and distrust of his ex-wife, by a feeling that he did not benefit from all of the funds that were advanced, or by a desire to conceal the loans as inconsistent with his immigration application, the Court need not decide. Any of those motivations would have been sufficient in the Debtor's mind. Because the Court has found the Debtor to have made false oaths which were material and which were made with intent to deceive, the Court hereby denies the Debtor a discharge pursuant to 11 U.S.C. § 727(a)(4).

Plaintiff argues the Debtor's discharge should be denied under other portions of Section 727. Since the Court has denied the Debtor a discharge under Section 727(a)(4), there is no need for the Court to address any of the other grounds alleged. Plaintiff also alleges her claim should

13

be determined to be non-dischargeable under Section 523. Because the Debtor's discharge has been denied in total, the request to determine the specific debt to be non-dischargeable is moot.

**Punitive Damages**

In the complaint, Plaintiff requests not only a determination as to whether the Debtor is entitled to a discharge and whether Plaintiff's claim is non-dischargeable but also asks the Court to award Plaintiff punitive damages under O.C.G.A. § 51-12-5.1. This section allows a court to award punitive damages "in such tort actions in which it is proven by clear and convincing evidence that the defendant's actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences." The action on which Plaintiff has prevailed, to deny the Debtor a discharge, is not a tort action and is not a state law action. The Bankruptcy Code does not provide for the recovery of punitive damages in prosecuting a Section 727 complaint. The denial of a discharge is punitive enough for the debtor's misdeeds in the bankruptcy case. Further, the Court's findings in this case regarding the Debtor's liability to Ms. Locci are based on a contract, the Acknowledgement of Debt, and not based on liability for a tort. As such, the request for punitive damages is denied.

**Attorneys' Fees**

Plaintiff also seeks recovery of attorney's fees and expenses under O.C.G.A. § 13-6-11, which provides such may be awarded "where the defendant has acted in bad faith, has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense." This state law provision could only apply to rights arising under state law, and not to an action under Section 727 of the Bankruptcy Code. There is no general right to recovery of attorney's fees under the Bankruptcy Code. See Ford v. Baroff (In re Baroff), 105 F.3d 439, 441 (9th Cir. 1997). This is particularly true with respect to a Section 727 action.

> An action under § 727 does not liquidate the debt, nor does it give the plaintiff a judgment on its claim. Moreover, an action under § 727 may result in a total denial of discharge, placing every creditor in the position of being able to pursue collection of debts, both liquidated and unliquidated. The creditor that seeks such relief under § 727, relief that ultimately inures to all creditors, does not gain any special or particularized benefit; it cannot liquidate its debt or obtain a judgment on its debt in an action under § 727.

Tuloil, Inc. v. Shahid (In re Shahid), 254 B.R. 40, 44 (B.A.P. 10th Cir. 2000); see also First United Bank & Trust Co. v. Buescher, 491 B.R. 419, 439 (Bankr. E.D. Tex. 2013). Since the claim on which Plaintiff prevailed was denying the Debtor a discharge under Section 727, no right to the recovery of attorney's fees is provided and such request is denied.

### CONCLUSION

Based on all the evidence, the Court finds the Debtor signed the Acknowledgement of Debt to Plaintiff and lied about his signature under oath. The Court denies the Debtor a discharge under 11 U.S.C. § 727(a)(4) and denies the remainder of the complaint as moot or not supported by the law as discussed herein.

### ### END OF ORDER ###

### DISTRIBUTION LIST

Maria Grazia Locci
c/o Macey, Wilensky & Hennings, LLC
303 Peachtree St. NE, Suite 4420
Atlanta, GA 30308

Todd H. Surden
Macey, Wilensky & Hennings LLC
303 Peachtree Street, NE, Suite 4420
Atlanta, GA 30308

Guy Marcel Siewe
4107 Hughes Lea
Tucker, GA 30084-1102

Gregory C. Okwuosah
295 Culver Street, Suite C
Lawrenceville, GA 30046